## HOFFMAN v. RIVERSIDE & DAN RIVER COTTON MILLS, Inc.

District Court, S. D. New York.

Feb. 16, 1944.

Harry Krauss and Benjamin Levine, both of New York City, for plaintiff.

Burke & Burke, of New York City (John H. Schmid, of New York City, and Frank Talbott, Jr., of Danville, Va., of counsel), for defendant.

SYMES, District Judge. (Orally.)

This is an action by the plaintiff against the defendant, the manufacturer of a certain rayon cloth or textile fabric under the

name of "Rivercool". The action is based on the anti-trust laws of the United States and alleges, in paragraph 10 of the complaint, that the defendants conspired together in 1942 and entered into a plan and scheme, the purpose of which was and is to completely monopolize the use of the plaintiff's material known as "Rivercool" cloth by limiting the sale thereof from the defendant manufacturer to the said fellow conspirators, that is, J. Friedman & Co., Smithson Serge Co. and Rose Bros., and to limit the manufacture of that product, that is, the cloth, into men's suits by the said three parties, and to control and establish a price of $13 per suit to the retail stores, for resale by them to the general public at the established price of $21.50 per suit.

The story related by the plaintiff on the witness stand and supported by evidence was that he had been a customer of the defendant's and was really the first to discover and develop the possibilities of this particular fabric.

This particular fabric is manufactured out of rayon and seems to be from the evidence a very light weight material and suitable for Summer suits.

It is then alleged that for three years plaintiff had purchased from the defendant considerable quantities of this material which he in turn made up into men's suits and sold to retailers who were his customers, who, in turn, sold to the general public.

The claim is that the defendant was, and ever since 1938 has been, and still is, the sole and exclusive producer and manufacturer of this type of cloth, consisting of a spun rayon with woven designs, and that in the year 1939 the plaintiff purchased from the defendant a quantity of such material which he manufactured into men's suits and resold to retailers in different States of the Union for resale by them to the general public; that the defendant has adopted the trade name of "Rivercool" for such fabric, causing the same to be widely advertised throughout the country under such trade name, and that it had become widely known and well popularized in the market dealing therein.

It is further alleged that said cloth is different from anything else in the market in this country, and that at all times mentioned the defendant had the sole and exclusive control of the process of manufacturing this product, that is, the spun rayon material with woven designs and that the said material is not purchasable from any other source whatever.

Then it is alleged that in 1939 to 1942, the defendant sold such material to the plaintiff and to two corporations wholly owned and operated by him and to a manufacturing contractor operating for and on behalf of the plaintiff, and that the plaintiff sold such manufactured suits to retail stores at not less than $10.75 a suit, and that the retail stores resold them for $17.95 a suit.

Then it is alleged in paragraph 9 that the defendant, in addition to selling the plaintiff, sold to the three other alleged conspirators, that is, Friedman, Smithson Serge Co. and Rose Bros., who also manufactured this material into suits in competition with the plaintiff.

That in 1942 the defendant required the plaintiff, as a condition for the continued sale to him by the defendant of this "Rivercool" material, to establish a retail store price of $13 per suit, to be resold to the general public by the retail stores at $21.50 a suit and not less, and that he advised the plaintiff that unless he did so, and maintained that price, the defendant would refuse to sell any goods to them in 1942 for the 1943 season. That really is the gist of the complaint.

It appears from the evidence, consisting wholly of the testimony of the plaintiff, supplemented by some depositions, that he was at no time a customer of the defendant company. His name did not appear upon their books. He never sent them any checks. No bills were sent out nor goods shipped to Mr. Hoffman, and he himself admits that he did absolutely no business with the defendant in his own name. It appears, however, that when he first attempted to develop this material and use it, that he used the trade name of Tailor-Craft Clothes, Inc., a corporation organized in New York, of which he apparently owned all the stock, but there is no evidence that the stock was ever issued to him or that he ever held any office in this company or that the corporation by any proper corporate action ever authorized him to deal with the defendant or anyone else on behalf of the corporation. His method of doing business was to obtain the cloth and have it billed to and delivered to Tailor-Craft Company, Inc. He then hired a contractor with a plant in Vineland, New Jersey, to take the material and made it up

into suits, which were shipped to customers on order obtained by the plaintiff, who was a traveling salesman and who made trips throughout the country selling these suits. Later, the company not proving profitable, he discontinued business under the name of Tailor-Craft, and made a contract with the New York firm of Rosenzweig & Pincus to make up the suits, for a couple of years, which plaintiff in turn sold to the trade. Later, however, the plaintiff complained that Rosenzweig & Pincus were not carrying out their oral agreement with him, that he could not do business with them, and he discontinued operations.

In 1942 the defendant company decided to cut down on the number of customers they were selling this "Rivercool" material to, and they immediately notified Rosenzweig & Pincus, who, plaintiff claims, was his "dummy" and whom he said he controlled and whose business was his business as far as the "Rivercool" material was concerned; that they could not buy any material in the Fall and Winter of 1942 to make up into suits for the 1943 trade. Thereupon, the plaintiff, becoming excited at this prospective loss of business, visited the plant of the defendant in Danville, Virginia, and made a protest. The evidence as to what happened when he called at the plant is very unsatisfactory. He tells one story, while two of the defendant's officials whom he contacted tell an entirely different story. Their story is that he was very incoherent, highly nervous and excitable, and they, out of the kindness of their hearts, sat and listened to his rambling tale to the effect that if he did not get an allotment of cloth for the coming season he would be put out of business.

It appears about that time the factory had notified Rosenzweig & Pincus that due to the fact that their account was unsatisfactory for reasons stated, to wit, they returned too many goods, made many complaints and made deductions for damages and other items, that the account was very unsatisfactory and therefore they would not deal with them any further.

There is also some evidence that about this time the Government entered into the field and took part of the defendant's product. It is to be assumed it was for war purposes although there is no evidence on that point.

The plaintiff claims that the defendant, beginning in 1941 and 1942, cut down the number of people to whom they made allotments of this cloth. It is well to observe here that "Rivercool" cloth, according to the evidence, is simply a very light weight cloth designed for Summer suits and slacks, and there is no evidence that it is a material of so exclusive or peculiar a nature that it cannot be imitated or that there are not other and similar materials of equal virtue on the market, suitable for light weight Summer suits. There is no evidence that light weight Summer suits sold throughout the country are to any unusual degree made from this particular material or that it has any virtues peculiar to itself that have not been or could not be copied or adopted by anyone else.

██ Of course it is the law that having built up a trade name and reputation for certain material under a trade name, that they have, to some extent, a monopoly on the use of that name and the goods it represents in dealing with the trade and the general public. The testimony is wholly lacking of any evidence upon which the Court can base a finding that there was any conspiracy as charged in this bill or that the defendant in any way attempted to dictate the use Rivercool was to be put to after it was shipped from the mill.

The Sherman Act, under which this action is brought, says in Section 2, 15 U.S.C.A. § 2: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States," etc., shall be guilty of a misdemeanor, and Section 7 of the same Act, 15 U.S.C.A. § 15, which the plaintiff relies upon, says, in part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue * * * and shall recover threefold the damages."

They manufacture Rivercool at their mills in Virginia and sell it. I know of no authority which says that a manufacturer of a product sold under a trade name cannot acting alone and under the circumstances here disclosed, pick his customers and refuse to sell to those who for any particular reason he does not care to do business with.

██ This particular cloth, as stated, is not one that people have to have. It does not constitute a necessity or anything like that in the sense that it is affected in any way with the public interest, such as food products, gasoline or oil, or transportation

services, or anything of that nature. So the usual rules re monopoly in necessities do not apply to this particular situation. There is some evidence that in 1942 a meeting was held at the office of the defendant company in New York City, but there is no evidence that that meeting was instigated or called by the defendant company. True, several of their customers were at the meeting or were represented thereat, but every witness called by the plaintiff who was at the meeting testified specifically that the defendant's representative, although present, took no part in the discussion, and that when any discussion of prices occurred, defendant stated emphatically that they would have nothing to do with such a deal, and there is no evidence at all of any agreement made at that meeting. It is true under the law a conspiracy cannot and does not have to be established by direct evidence. The Court has the right to look to the conduct of the parties and their acts under all the circumstances. The Court cannot open the minds or the heads of the parties charged with a conspiracy and definitely say and determine what their intentions were, but before we can find there was such a combination as charged here there must be some concrete evidence from which the Court can draw the proper and necessary inferences to establish the conspiracy. But the evidence here, considered as a whole and in the light most favorable to the defendant, considering the witnesses, their manner and demeanor on the stand, wholly fails to meet that test.

This plaintiff, as stated, was never in business for himself. He carried on business under two different corporations or names, claiming that he controlled the particular dummies he used to carry on his business, and his son Daniel was the active officer. He claims he controlled Rosenzweig & Pincus, yet when it came to a difference of opinion with them, he seems to have been unable to control them, but went along and was dictated to by them because, according to his testimony, he could do nothing else.

There is no evidence of any damage here. The plaintiff has absolutely no records of his business or of his financial transactions or of profits or losses made or experienced in his business during any of the time referred to in the evidence. It is true that the Court might spell out a discrimination practiced by the defendant against a certain portion of the trade which had been using "Rivercool" cloth but there is no evidence that the reasons that the defendant gave or that they were actuated by any motives that were unreasonable in any way were other than good legitimate business reasons or grounds upon which men in business ordinarily are prompted to judge whom they will deal with, and as stated before, the Court finds no authorities or no reason to hold that the defendant did not have a right to sell the three customers as that the plaintiff claims.

There is undisputed evidence that these three manufacturers of clothing, or alleged co-conspirators, only received 27 per cent of defendant's total production of cloth and that the balance or 73 per cent was sold to another concern known as the Atlas Raincoat Company, which used it to make up into suits. Therefore it is clear that this 73 per cent of the product which was made up into suits would afford sufficient competition with the 27 per cent which went to the alleged co-conspirators, and thus prevent any price control if any had been attempted.

I therefore find from this whole record that the plaintiff was never a customer of the defendant, nothing more than a broker who got the cloth and turned it over to a subcontractor who made it up for him. There is no evidence that he suffered any damage and in that connection the Court may observe that he did not call as witnesses in his behalf anyone from the firm of Rosenzweig & Pincus who, he claims, was unduly damaged or injured by defendant's conduct. Furthermore, he has not produced and has not in his possession any records or books of the kind a man and doing the business he claims to have done would ordinarily have kept. He has absolutely no records or books of any kind that throw any light to support in any way his verbal statements as to the nature of his business or the extent thereof.

Furthermore, there has been no monopoly shown. For these reasons the motion to dismiss on the merits at the end of the plaintiff's case must be and is granted and it is so ordered.